**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CHARLES GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:08-CV-0186-DGK |
| | ) | |
| UNION SECURITY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## SUMMARY JUDGMENT ORDER

Plaintiff Charles Green ("Green") brings this action pursuant to the Employee Retirement Income and Security Act ("ERISA") following Defendant Union Security Insurance Company's ("Union") denial of his application for long-term disability benefits. Now pending are the parties' cross motions for summary judgment. After review of the entire record Union's motion (Doc. 58) is DENIED and Green's motion (Doc. 60) is GRANTED.

### Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. But the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

**ERISA Standard of Review**

Where the ERISA plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, this Court reviews the denial of benefits under an abuse of discretion standard. *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2006) (citing *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004)); *accord Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The decision of the plan administrator should be reversed only if it is arbitrary and capricious. *Groves*, 438 F.3d at 874 (citing *Hebert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004); *cf. Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 946 n.4 (8th Cir. 2000) (holding that the level of review "for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference," and that the terms are generally interchangeable). "When a plan administrator offers a reasonable explanation for its decision, supported by substantial evidence, it should not be disturbed." *Ratliff v. Jefferson Pilot Fin. Ins. Co.*, 489 F.3d 343, 348 (8th Cir. 2007). Substantial evidence is "more than a scintilla but less than a preponderance." *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008) (citation omitted).

In this case the parties agree that the plan grants discretionary authority to the administrator, so the abuse of discretion standard of review applies. The Court's review under this "deferential standard is limited 'to evidence that was before' the [administrator]." *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997) (quoting *Collins v. Cent. States S.E. & S.W. Areas Health & Welfare Fund*, 18 F.3d 556, 560 (8th Cir. 1994)); *accord Ravenscraft v. Hy-Vee Employee Ben. Plan & Trust*, 85 F.3d 398, 402 (8th Cir. 1996) ("In conducting judicial review under the deferential [abuse of discretion] standard, the reviewing court looks to the evidence before the Plan administrators when they denied the claim.") (citation omitted). "The purpose of this caveat is to 'ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators.'" *Cash*, 107 F.3d at 641-42 (quoting *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993)). "A district court may admit additional evidence in an ERISA benefit-denial case, however, if the plaintiff shows good cause for the district court to do so." *Brown v. Seitz Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998) (citing *Ravenscraft*, 85 F.3d at 402).

Where the plan administrator both evaluates claims for benefits and pays benefits claims it approves, the administrator is operating under a conflict of interest that must be weighed as a factor in the Court's determination whether the denial of benefits was an abuse of discretion. *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2350 (2008). The conflict of interest is weighed as one of several factors and "serves 'as a tiebreaker when the other factors are closely balanced' and is 'more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision' and 'less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy.'" *Hackett v. Standard Ins. Co.*, 559 F.3d 825, 830 (8th Cir. 2009) (quoting *Glenn*, 128 S.Ct. at 2351).

**Procedural and Factual Background**

**Green's employment and the Plan**

Plaintiff Green is forty-four years old, holds a GED, and has sixteen years of work experience as a light industrial and warehouse worker. Green worked for Andersen Distributions, Inc. ("Anderson") as a warehouse worker from November 13, 2000 until February 20, 2001, earning $1,960.00 a month.

Andersen provides long-term disability benefits to its employees pursuant to The Anderson Long-Term Disability Insurance Plan ("the Plan). Union insured the Plan under a group insurance policy ("the Policy"). The Plan and the Policy are governed by ERISA, 29 U.S.C. § 1001, *et seq.*

Green participated in the Plan. Under the Policy, as a full-time hourly employee, Green was classified as a Class II employee. The Policy states,

> *Disability* or *disabled* means that in a particular month, you satisfy either the Occupation Test or the Earnings Test, as described below. You may satisfy both the Occupation Test and Earnings Test, but you need only satisfy one Test to be considered *disabled.*"
>
> Occupation Test
>
> ***
>
> For *covered persons* in Class II, III, and IV:
>
> during the first 24 months a *period of disability* (including the *qualifying period*), an *injury*, or sickness, or pregnancy requires that you be under the *regular care and attendance* of a *doctor*, and prevents you from performing at least one of the *material duties* of your regular occupation; and
>
> after 24 months of *disability*, an *injury*, sickness, or pregnancy prevents you from performing at least one of the *material duties* of each *gainful occupation* for which your education, training, and experience qualifies you.

4

(Emphasis in original). The Policy defines the italicized words as follows: "'*Material duties*' means the sets of tasks or skills required generally by employers from those engaged in a particular occupation; and '*gainful occupation*' means an occupation in which you could reasonably be expected to earn at least as much as your Schedule Amount." (Emphasis in original). The Policy provides that the Schedule Amount for "Class II covered persons" is "66 2/3% of *monthly pay* subject to a maximum Schedule Amount of $10,000 per month." (Emphasis in original).

Under the Plan and Policy, Union had "sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy. All determination and interpretations made by [Union] are conclusive and binding on all parties." The Policy requires the participant to "furnish whatever items we decide are necessary as proof of loss or to decide our liability. . . . If you do not furnish any required information or authorize its release, we will not pay benefits."

**Claim History**

**Union approves benefits under the "regular occupation" test.**

Green stopped working in February of 2001, due to the combined disabling effect of several conditions, including fibromyalgia, migraines, chronic back pain, and chronic neck pain.

On November 12, 2001, Green applied to Union for long-term disability ("LTD") benefits, claiming that he was unable to perform his job duties of lifting over ten pounds and standing for a long period. He reported his injury as cervical and lumbar pain. Green submitted an "Attending Physician's Initial Statement of Disability" ("Initial Statement") which had been completed on November 9, 2001 by his primary care physician, Steven D. Rettinger, M.D, a family practice doctor. Dr. Rettinger concluded that Green's primary diagnosis was chronic

back pain, chronic neck pain, fibromyalgia, and tremor, with subjective symptoms of neck and back pain and tremor, and objective findings of a "central disc bulge at C-3-4, C4-5, and C5-6 without evidence of herniated nucleus pulpous nor spinal stenosis." At this time Dr. Rettinger believed that Green had a "moderate limitation of functional capacity" and that Green was "capable of clerical/administrative (sedentary) activity."

Around this time Green began experiencing the symptoms of fibromyalgia. On May 23, 2001, Dr. David Cooley, M.D., F.A.C.P., rheumatologist, wrote Green "has symptoms highly suggestive of a primary fibromyalgia disorder with a restless, non-restorative sleep pattern multiple trigger points, back discomfort, fatigue and morning stiffness." On June 8, 2001, Dr. James Appelbaum, M.D., a neurologist, wrote that Green "has a diagnosis of fibromyalgia. He describes throbbing headaches associated with nausea, phono/photophobia about 3-4 times a week. He has chronic neck and back pain as well as pain in the extremities. He complains of paresthesias throughout his body as well as weakness, fatigue and insomnia." On December 18, 2001, Dr. Appelbaum wrote that "[o]n exam, the patient has numerous trigger points consistent with a diagnosis of fibromyalgia."

Most of Green's health problems did not go away. On February 18, 2002, Dr. Appelbaum wrote Dr. Rettinger that,

> I saw your patient in follow-up today regarding headaches, neck pain, and tremor. He says the Klonopin 0.5 mg b.i.d. has helped with his tremor. Other medications are the Zoloft, Oxycontin, and Nortriptyline. He complains of continued aches and pains throughout the body. On exam there are numerous trigger points. The tremor has resolved. Reflexes, strength, coordination and sensation normal. The patient's essential tremor is better. He still has fibromyalgia.

During roughly this same time frame, between December 20, 2000 and January 23, 2002, Dr. Rettinger began prescribing many different medications, including Propoxyphene,

Methylprednisolone, Hydrocodone, Carisoprodol, Valtrex, Nortriptyl, Ranitidine, Butalbital, Oxycontin Cyclobenza, Zoloft, Imitrex, and Nexium. Dr. Rettinger was not, however, simply writing scripts, he was also pushing Green to get better. On August 16, 2001, Rettinger had "an extended discussion" with Green and told him that he needed "to take control of his own life and call his place of employment so that he can get off disability and get back to work."

On February 6, 2002, Union awarded Green disability benefits effective January 20, 2001, under the "regular occupation" definition of disability. Union also determined that Green would become eligible for disability benefits under the "gainful occupation" definition of disability on or around February 23, 2003.

**Union begins review under the "gainful occupation" definition of disability.**

In February 2002 Union began to evaluate whether Green was entitled to benefits under the "gainful occupation" definition of disability. Union referred Green to Healthsouth for a functional capacity evaluation ("FCE"). Healthsouth's February 22, 2002 report ("the Healthsouth FCE" or "FCE") stated:

> Functional testing revealed that he is presently lifting in the sedentary category of work (according to U.S. Department of Labor Standards) as demonstrated by an occasional floor to knuckle lift of 10 lbs., knuckle to shoulder lift of 15 lbs., shoulder to overhead lift of 10 lbs., and carry of 10 lbs. 100 feet with pivoting. . . . During positional tolerance testing, Charles demonstrated tolerance of walking, stair climb (with use of railing), trunk bend (sustained and repetitive stoop), overhead reach, trunk twist, and standing forward reach (both repetitive and sustained) on an occasional basis and standing and seated forward reach (both repetitive and sustained) on a frequent basis. Charles also demonstrated the tolerance of sitting on a constant basis.

The report concluded that "Green demonstrates the ability to perform sedentary work for an eight hour day."

On April 11, 2002, Union informed Green that he might be eligible for Social Security Disability Benefits ("SSDB"), that under the terms of the Policy Union could reduce his LTD benefits by the amount of SSDB for which was eligible, and that Green had until September 1, 2002 to apply for SSDB. On July 19, 2002, the Social Security Administration ("SSA") initially denied Green's claim for SSDB because Green's "condition was not severe enough to keep [him] from working."

Concerned that Green might "be more active than his diagnosis indicates," on April 29, 2002, Union submitted Green's LTD file to its in-house investigative services unit to conduct pretext telephone calls and possible surveillance. These calls were made at various times to Green's home, but Green always answered, proving he was in fact at home.

Union also referred Green's medical records to Dr. Allen J. Parmet, a board certified physician in occupational medicine, for review. Dr. Parmet's May 20, 2002 report noted that Green's diagnoses included "fibromyalgia syndrome. The patient does meet the diagnostic criteria for the American College of Rheumatology's protocol." It also stated, "Claimant's prognosis is guarded. It is difficult to predict long term outcome of fibromyalgia cases. They are typically stabilized after two to three years of onset. Objective findings are consistent with the subjective symptoms of fibromyalgia syndrome." Dr. Parmet also noted, "There is evidence of depression and anxiety in this patient . . . this has been appropriately treated." Dr. Parmet recommended "[n]o additional treatment…." but "[v]ocational rehabilitation . . . as the patient is capable of performing sedentary activities." Based on the Healthsouth FCE, Dr. Parmet concluded that Green had "the ability to perform at the sedentary level of labor . . . on an eight hour workday, forty hour work week, on that basis. Workplace accommodations are required to

permit him to change position, as needed, and to assure that the work duties lie within the sedentary limits."

On May 21 and on July 16, 2002, Green submitted to Union supplemental reports from Dr. Rettinger. In both reports Dr. Rettinger stated Green could frequently lift and carry no more than ten pounds, occasionally lift and carry no more than ten pounds, stand and walk less than three hours, and sit a total of less than three hours. Dr. Rettinger also advised Green to obtain vocational rehabilitation. In the May 21 supplemental report Dr. Rettinger wrote Green was "unable to stand/sit for extended periods, unable to do even minimal manual labor due to back/neck pain (chronic)." Dr. Rettinger noted Green could sit for less than three hours per day, stand and walk for less than three hours each day, and lift and carry ten pounds. In each report Dr. Rettinger also stated that Green was a suitable candidate for vocational rehabilitation services.

On August 21, 2002, Green completed a "Behavioral Phone Questionnaire." In it Green stated he suffered from loss of sleep, migraines, depression, and constant pain, and that he took Zoloft for the treatment of depression, and Vicodin and Oxycontin for the treatment of pain. He also stated that in June he had begun seeing Dr. Martha Aitkens, a chiropractor.

On August 26, 2002, rehabilitation counselor Julie E. Finnegan, MA, CRC, conducted a transferable skills analysis ("TSA") to identify potential occupational positions that Green could perform given his work experience and medical restrictions. Finnegan concluded that there were no suitable jobs found in Green's labor market when considering his wage requirement of $10.45 an hour, but that Green could potentially secure certain sedentary work with some features of light work, positions that paid an hourly wage of $7.54.

On September 19, 2002, Green's treating physician for chronic pain, Dr. Samuel R. Lehman, M.D., examined him and wrote "Green is . . . disabled from fibromyalgia and headaches . . . the patient is clearly having a lot of headaches and a lot of pain which is not responsive to the medications he is on."

On September 24, 2002, Dr. Rettinger completed a "Medical Source Statement" regarding Green's physical capabilities. It indicated Green:

1. Can sit 2-3 hours/day
2. Can stand/walk 4 hrs/day
3. Must rest 4-5 hrs/day
4. Can never left even 1-5 lbs.
5. Balance, stoop: rarely/none
6. Forward flexion, backward flexion, rotation right or left of neck: rarely/none
7. Reaching with right hand/arm or left hand/arm: rarely/none
8. Handling with right hand/arm or left hand/arm: rarely/none
9. Fingering with right hand/arm or left hand/arm: rarely/none
10. Period of restriction has existed since February 20, 2001
11. Diagnoses: (1) Fibromyalgia; (2) Chronic neck pain; (3) Chronic back pain.

On November 19, 2002, at Union's request, Dr. Rettinger completed a "Supplementary Report for Benefits" indicating that Green remained disabled from working in any occupation.

On November 21, 2002, at Union's request, outside consultant Brenda M. Umholtz, M. Ed. C.R.C., conducted a labor market survey ("LMS") using local newspapers, Monster.com, and Career Builder. She located a minimum of ten light or sedentary duty positions she believed were within Green's physical capabilities and restrictions paying an hourly wage of more $7.54, the hourly equivalent of Green's schedule amount. Ms. Umholtz identified the following positions: (1) Check N Go — Customer Service representative, (2) Nationwide Auction Systems — security guard, (3) UniGuard — security officer, (4) Barton Protective Services — security officer, (5) First Response — unarmed security, (6) Olathe Medical Center — security, (7) Pinkerton-Burns — security, (8) Transamerica, Inc. — underwriting support administrator, (9)

Parody — sales associate, (10) Top Notch Heating & Co. — dispatcher/customer service representative. Ms. Umholtz concluded that "positions beginning at $8.00/hour are readily available in [Green's] geographical area with positions ranging up to $10.00/hour." Ms. Umholtz noted that "these positions were relatively easy to locate even with [Plaintiff's] restrictions of alternative sitting/standing and lifting under 10 pounds. It appears additional education or vocational training would not be required in order to locate positions in the range of $8.00-$10.00/hr."

Union subsequently decided Green would not require vocational training to obtain a position within his medical restrictions that paid an hourly wage of $8.00 to $10.00. On December 4, 2002, Union notified Green that based on Umholtz's LMS it did not believe that he required additional training or vocational rehabilitation to return to gainful employment.

In late February 2003 Patricia J. Neubauer, Ph.D., a psychologist on Union's Behavioral Health Services Staff, reviewed Green's medical records from a psychological perspective. In her February 25 report, Dr. Neubauer found Green "has a primary pain disorder related to a general medical condition, fibromyalgia and migraines and has psychological factors that impact his pain complaints." Dr. Neubauer remarked that Green's "history and file would indicate that he has generalized anxiety and possible panic attacks." Dr. Neubauer concluded:

> The review of the file is highly suspicious that Mr. Green's psychological overlay is a significant part of his chronic pain condition and failure to return to a functional status. However, there are no psychological evaluations to assist with understanding that overlay. Dr. Rettinger reported that the Shawnee Mission pain program told him that Mr. Green needed behavioral pain management in April of 2001. Mr. Green was not referred and Dr. Rettinger prescribed antidepressants at low dosages for pain management. The Zoloft and Nortriptyline were somewhat helpful for the pain management but may not have been sufficient for treatment of depression. Mr. Green's current status and limitations are unknown. The [Social Security] notice indicated that Dr.

Vandenberg, a local forensic psychologist, did an evaluation. The notice also mentions Dr. Fortune, specialty unknown. The evaluation by Dr. Vandenberg would assist with the review for the change in definition.

On February 26, 2003, Union wrote Yvonne Ernzen, Green's attorney at the time, to request the medical reports of psychological evaluations from Cedric Fortune, M.D. and Gerald Vandenberg, Ph.D, both of whom had evaluated Green for the Social Security Administration ("SSA").

**The Social Security Administration awards disability benefits to Green.**

On February 28, 2003 an administrative law judge ("ALJ") with the Social Security Administration granted Green social security disability insurance benefits, finding him disabled and unable to perform "any substantial gainful activity" within the meaning of the Social Security Act, § 216(i) and 223, as of February 20, 2001. The ALJ found "[m]edical evidence on file establishes that the claimant has a panic disorder/anxiety; depression; chronic pain syndrome and fibromyalgia. One or more of these disorders impose significant limitations on claimant's inability to function in the workplace and he therefore has a 'severe' impairment as that term is defined in the regulations." The ALJ noted,

> …claimant has essentially alleged that he is unable to perform his past relevant work or any other work due to pain, fatigue, numbness, muscle spasms, decreased sleep, decreased attention/concentration, depression and panic attacks. On review, the Administrative Law Judge finds claimant's allegations of record to be credible and consistent with substantial evidence of record including the specific opinions of his treating physician and his treating neurologist.

The ALJ gave some weight to Dr. Rettinger's opinions, stating "[the ALJ] finds Dr. Rettinger's restrictions to be incompatible with competitive employment." The ALJ noted that Green "has been maintained on a significant pain medication regimen and has as well been tried on many

different treatment regimens with very good compliance;" and that Green had "a good work record preceding his alleged onset of disability." He concluded that "claimant retains the residual functional capacity for less than competitive employment at any exertional level due primarily to his unremitting pain, fatigue and need to rest during the day."

During this same period in 2003 other medical evidence began accumulating indicating that Green was incapable of working. On January 31, 2003, Dr. Lehman wrote a letter stating,

> I have been following Mr. Charles Green over the last several months. The patient has the diagnoses of migraine, fibromyalgia, restless leg syndrome, and acid reflux. He has undergone a large number of investigations and has had a large number of different medication treatments. He continues to have severe pain. It is my medical opinion that the patient is incapacitated for work and it would be my medical opinion he be considered completely and totally disabled because of his painful condition.

In a June 11, 2003 treatment note Dr. Lehman wrote, "…Patient continues to have a lot of pain with his low back and he states is having increasingly severe migraines. He also has complaints of his tremors of his upper extremities." On June 19, 2003 he added, "He is having exacerbations of severe low back pain. He went to the emergency room recently was given Demerol . . ." In a July 8, 2003 treatment note, Dr. Rettinger noted, "His back is getting worse . . ."

On March 26, 2003, Green's attorney Yvonne Ernzen informed Union that the SSA had awarded Green Social Security disability benefits ("SSDB") on February 28, 2003, based on a diagnosis of fibromyalgia, depression, and anxiety. She stated that she did not have copies of Drs. Fortune and Vandenberg's medical records, and she disputed the relevance of these records to Green's application for LTD benefits. She agreed to provide Union with copies of the additional information that Green had provided the SSA in his appeal of its initial denial of his

application for SSDB.  On March 31, 2003, Ernzen provided Union with the SSA's February 28, 2003, decision and the additional information that Green had submitted in support of his appeal.

On June 6, 2003, Union wrote Ernzen to again request the medical records of Drs. Fortune and Vandenberg.  On June 24, 2003, Ernzen wrote Union to reiterate that she considered these records to be "irrelevant" because they were not Green's treating physicians, and she again refused to accede to Union's request.  On July 16, 2003, Union wrote Ernzen to inform her that Union considered the medical records of Drs. Fortune and Vandenberg to be relevant to the determination of whether Green qualified for LTD benefits under the terms of the Plan and the Policy.  Union informed Ernzen that Union intended to refer Green for an independent medical examination.

On August 25, 2003, Union wrote Ernzen to inform her that Union required Green to submit to an independent medical examination by a psychologist.  An outside vendor hired by Union referred Green to a psychologist who scheduled an examination for September 15, 2003. On September 10, 2003, Green informed the doctor's office that he would not appear for the September 15, 2003, examination because he was feeling weak.  The appointment was rescheduled for October 22, 2003.  On October 21, 2003, Green again cancelled the appointment, explaining that owing to illness he could not attend an appointment until after November.

**Union denies benefits under the gainful occupation test.**

On or about October 31, 2003, Union denied Green's application for LTD benefits because he did not meet the gainful occupation definition of disability in the Policy's occupation test.  Union stated Green's file did not contain a claim for a non-physical condition.  Union wrote that it had requested information pertaining to a possible psychiatric disability but that Green

failed to respond or otherwise provide the information.  Union also noted Green had twice failed to attend an independent medical examination into his psychological condition.

Union stated Green was also "able to perform work activities in sedentary work settings," which, using the same standard as the Department of Labor, it defined as, capable of exerting up to 10 pounds of force occasionally (up to one-half of the time) and/or a negligible amount of force frequently (one-half to two-thirds of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.  Union defined sedentary work as sitting most of the time, but may involve walking or standing for brief periods of time.

Union noted that although Dr. Rettinger reported Green could sit for less than three hours per day, stand and walk for less than three hours each day, and lift and carry ten pounds, the Healthsouth FCE found Green capable of occasionally lifting ten pounds, knuckle to shoulder lifting fifteen pounds, shoulder to overhead lifting ten pounds, and carrying ten pounds for 100 feet with pivoting, and performing sedentary work eight hours per day.  Based on its vocational assessment of Green's work skills and experience, Union stated it had identified via the LMS "numerous positions in Mr. Green's geographic area that he would physically be able to perform and for which he is qualified" that would afford Green a reasonable expectation "to earn at least as much as his Schedule Amount of benefits, or $1,307 per month," thus he was "capable of performing the material duties of a gainful occupation."    Union terminated Green's LTD benefits as of October 21, 2003.

**Union denies Green's first appeal.**

On July 8, 2004, Green appealed Union's benefits decision, providing an overview of his claimed disabilities and submitting additional medical records.  Green's submissions included a May 11, 2004 report from his treating neurologist Dr. Lehman diagnosing Green as suffering

from cervical radiculopathy, lumbar radiculopathy, and fibromyalgia; reports from Dr. Mark Greenfield concerning his back; 2003 and 2004 medical notes and progress notes from Dr. Rettinger; and a July 6, 2004 report from Jerold Hildre, a vocational expert hired by Green to render an opinion whether there were suitable jobs existed for Green.

Dr. Lehman's assessment, which was based on a clinical evaluation, found that Green could sit continuously for one hour, for a maximum of two hours in an eight-hour workday; that after sitting for an hour, Green could only stand or walk for less than 15 minutes; and that after standing or walking, Green must be able to alternate postures by lying down or reclining in a supine position, and he must be able to do this for 30 minutes to an hour. Dr. Lehman opined that the total amount of time Green was able to spend standing or walking in an eight-hour workday was less than an hour. Dr. Lehman indicated Green needed more rest than just a morning break, a lunch break, and afternoon breaks schedules at two hour intervals. Dr. Lehman believed Green could sit for two to three hours, stand or walk for four hours, but must rest four to five hours. He also indicated that Green could lift as much as one to five pounds only rarely.

On May 18, 2004, Dr. Greenfield completed a "Medical Source Statement" supporting Green's claim that he was unable to work.

In a March 3, 2004 treatment note Dr. Rettinger wrote, "The patient's back pain has been largely unchanged in spite of the epidural steroid injections. He remains dependent on MS Contin for pain relief…"

Plaintiff's vocational expert Jerold Hildre's report argued that the transferable skills analysis conducted by Julie Finnegan failed to show or find suitable jobs that Green could perform, and that Union incorrectly interpreted the results of Brenda Umholtz's labor market study ("LMS") and the transferable skills analysis ("TSA"). Hildre stated, "From a vocational

standpoint, the TSA and LMS do not establish that there are sedentary occupations that Mr. Green could perform on the basis of his education, training, or experience. Nor does it appear that the LMS was based upon the TSA." Hildre stated the LMS found only one job, customer service representative, that would be considered sedentary, but Green did not possess skills that would transfer to this position.

On August 11, 2004, Union wrote Ernzen to apprise her of the status of Green's appeal, inform her that Union would require additional time to complete its review, and request additional information from Green. Union asked Green to complete an "Activities of Daily Living Questionnaire," provide a list of any adaptive equipment Green uses for the completion of daily tasks, provide a copy of his Social Security award, identify his pharmacy, and sign a "Reimbursement Agreement" acknowledging his obligation under the Plan and the Group Policy to repay an overpayment on his claim.

On August 25, 2004, Union asked Dr. Rettinger to review Green's February 20, 2002, FCE.

On August 25, 2004, Dr. Patsy Maikranz, a consulting physician who is board certified in internal medicine, provided a "Clinical Services Summary" which was based on a medical review of Green's claim file. In her report, Dr. Maikranz concluded that Green "appears to have the capacity to do sedentary work that would allow for position change hourly based on a diagnosis of fibromyalgia." Dr. Maikranz recommended a psychological review of Green's claim file and an occupational IME with a two-day FCE to clarify his physical functional status.

On September 16, 2004, Union received Green's completed "Activities of Daily Living Claim Statement." In the statement, Green indicated he was able to bathe, dress, eat, maintain personal hygiene, and use the toilet without another person's assistance.

On September 14 and 15, 2004, a member of Union's Investigative Services Unit, Eric Gilbert, conducted video surveillance of Green. Gilbert's report and the video show the following: On Tuesday, September 14 he arrived outside of Green's residence[1] at 8:15 a.m. At 1:47 p.m. Green left the house, got into a pick-up truck, and drove to the Mid-American Physicians office where he arrived at 2:02 p.m. Green went inside, returned to the truck at 2:05 p.m., and then drove back, arriving home at 2:18 p.m. At 2:23 p.m. Green drove to a nearby post office, mailed a letter, and returned home at 2:27 p.m. No other activity is observed for the rest of the day. During these trips Green did not appear to have difficulty getting in or out of the pick-up truck.

On Wednesday, September 15 Gilbert began his surveillance at 7:30 a.m. At 2:00 p.m. Green left the house in a car, drove to nearby gas station, put gas in the car, and then left at 2:06 p.m. He then drove to a Time Warner store, arriving there at 2:40. He went inside and came out three minutes later carrying a small box. He placed the small box in the trunk of the car, drove home, took the box out of the trunk, and carried it into the house at 2:59 p.m. At 3:36 p.m. Green drove back to the Time Warner store. He arrived at 3:54 p.m. and went inside. At 3:57 p.m. he came back out carrying box similar in size to the one he had carried earlier. He put the box in the trunk and drove home. He arrived home at 4:13 p.m., removed the box from the trunk and entered the house. Green did not appear to have difficulty getting in or out of the car, filling the car with gas, carrying the box, or placing it into (or removing it from) the car's trunk, and nothing else was observed before Gilbert ended the surveillance at 5:00 p.m.

After reviewing Gilbert's surveillance video and report Dr. Maikranz issued an addendum to her August 25, 2004 report on September 22, 2004. In the addendum Dr. Maikranz stated that the surveillance report "establishes that [Green] has the capacity to use his hands for

_____

[1] Although Green used to live independently, he now lives with his mother.

activities that his treating physicians did not think he could do — like grasping, handling and reaching." Dr. Maikranz concluded that the surveillance results were consistent with the results of the February 20, 2002, FCE.

On September 27, 2004, Union received an inventory of Green's prescription history from two pharmacies. The inventories show Green had been prescribed many different drugs, including Morphine Sulfate, Hydrocodone, Oxycontin, Celebrex, Zoloft, and Seroquel.

On September 27, 2004, Union wrote Ernzen to inform her that Union intended to schedule an independent medical examination ("IME") of Green by a board certified occupational medicine specialist. Union also informed Ernzen that Dr. Rettinger had failed to return telephone messages from Dr. Maikranz requesting that he discuss with her Green's "functional status." Union asked that Ernzen contact Dr. Rettinger and instruct him to contact Dr. Maikranz.

On October 13, 2004, Union sent Dr. Lehman a copy of Green's February 20, 2002, FCE, and asked him to "provide written comments on the differences in Mr. Green's level of function per his medical records compared to the FCE findings."

Around this same time Union retained Elite Physicians, Ltd. ("Elite Physicians") to arrange for an evidence-based IME of Green. Union paid Elite Physicians $1,495 for the IME. On October 28, 2004, Elite Physicians gave Green an appointment on November 24, 2004 to meet with Dr. Chris Fevurly, M.D., for his IME. Green canceled and rescheduled this appointment twice before meeting with Dr. Fevurly.

On November 4, 2004, Mike Jones, Ph.D., a psychologist in the Union Behavioral Services Department, completed a "Behavioral Health Services Assessment," which was based

on a review of Green's claim file from a "medical/nervous conditions" perspective. Dr. Jones concluded:

> Available mental status information failed to substantiate any significant mental health symptoms. Mr. Green's request for Viagra on 12/29/03 demonstrated a lack of symptom of anhedonia, decreased energy, or mental slowing. Individuals that present with actual symptoms of serious depression would not have the mental energy to demonstrate an interest in sexual functioning. The records reflected that Mr. Green was not compliant with medications prescribed by his physicians. This could have had an impact on actual treatment outcome for his physical complaints. The lack of compliance indicated that Mr. Green might have another agenda regarding his lack of response to treatment.

Dr. Jones also recommended that Union request the medical records of Dr. Vandenburg and Dr. Norman Heisler, a psychiatrist who had treated Green.

Green canceled his November 24 appointment for an IME with Dr. Fevurly and rescheduled it for January 5, 2005. Green subsequently canceled this appointment and rescheduled it for January 26.

On January 26, 2005 Dr. Fevurly met with Green for the IME. Dr. Fevurly is board certified in internal medicine, board certified in preventive medicine with a specialization in occupational medicine, and board certified independent medical examiner, but he is not a rheumatologist or a neurologist. Dr. Fevurly interviewed Green for 47 minutes, conducted a physical exam for 23 minutes, reviewed Green's nearly three inch thick medical history and the surveillance video, and then wrote an eight page report dated January 27, 2005.

Dr. Fevurly's report concluded the following about Green's medical condition:

> 1. Chronic pain complaints with no objective abnormalities on current assessment.
>
> > a. He does not meet the ACR [American College of Rheumatology] criteria for fibromyalgia disorder but

demonstrates generalized tenderness not localized to the 18 tender points of the ACR criteria.

b. This is a functional somatic syndrome and includes the diagnosis of fibromyalgia, chronic fatigue syndrome, and somatization disorder.

c. There are underlying psychological features with probable affective disorder and anxiety disorder manifested by depression and anxiety.

2. Essential tremor that goes away upon distraction.

3. Non-physiologic findings and inconsistent findings on physical exam. The videotape revealed significant difference between his pain behavior in the examination room as compared to the two days of screening on the videotape.

4. Degenerative changes in all segments of the spine. There is neither examination or MRI evidence for neurogenic compromise. These changes are frequently present in asymptomatic people in this age group. These findings are likely incidental and not clinically related to the chronic pain complaint.

5. Opiate dependency.

The "Discussion" section of the report stated Green,

describes chronic pain without objective abnormality on assessment. There are underlying psychological, social, behavioral and environmental factors that significantly contribute to his chronic pain complaints. He does not meet the criteria for fibromyalgia disorder (based on ARC criteria). The diagnosis for his current pain is best described as functional somatic syndrome. (I have included chapters from text that describes these functional somatic syndromes, their cases and the difficulties in performance of impairment assessment/disability assessment).

There are no objective factors upon which to assess impairment or disability. Mr. Green describes severe pain and states that he cannot perform any activities; however, there are significant inconsistencies in his demonstrated abilities as described above.

Based on the objective features, there are no permanent restrictions or limitations. Mr. Green is deconditioned from his lack of activity over the past 4 years but the major limiting factors are

psychosocial. **There are no objective factors upon which to recommend sitting or standing limitations. There are no accommodations that are necessary for return to work. Mr. Green is currently qualified to work a regular eight-hour day and/or 40-hour work shift based on objective factors;** having said that there are profound, well-established illness behaviors, perceptions, and psychological factors limiting his ability to make functional progress.

(Emphasis added.)

In the "Answers to Other Questions" section of the report Dr. Fevurly wrote, "The functional capacity assessment performed in February of 2002 is a snapshot of Mr. Green's willingness to perform certain functional activities. This FCE does not reflect a valid representation of Mr. Green's current objective abilities." Dr. Fevurly also criticized how other doctors attempted to manage Green's pain.

> The medications in current use demonstrate a dependency on oral opioids. He has made no functional recovery while taking these high doses of oral opioids; thus, their continued use is contraindicated. Oral pain medicines may be reasonable if the patient is able or willing to make functional progress; however, in the face of nearly four years of no functional improvement, the chronic use of opioids is not recommended.

Dr. Fevurly concluded that "Green has expressed the desire not to return to the workplace. It is unlikely that [he] is willing to be a participant in his recovery and it is unlikely that he is willing to make functional progression. Unfortunately, Mr. Green is deeply invested in his current sick role."

Dr. Fevurly attached to his report excerpts from several different texts, including a chapter from a book titled "Whiplash and Other Useful Illnesses." The thesis of the excerpted chapter is that the diagnosis of fibromyalgia is a "medical myth" kept alive by rheumatologists and plaintiffs' lawyers because they have an enormous financial interest in doing so.

On March 3, 2005, Union wrote Green that it agreed with Dr. Fevurly's "conclusion that there are no objective factors upon which to recommend sitting or standing limitations and that there are no accommodations necessary for a return to work." Union indicated there was no need for the IME report to be reviewed by a physician consultant.

Also on March 3 Richard Hubbard, a specialist in Union's Vocational Services Department, issued a "General Assessment and Review of Outside Vocational Expert Findings" which reviewed Brenda Umholtz's labor market survey in light of Jerold Hildre's expert report. Hubbard concluded that Green could actually perform only eight of the ten jobs identified in Umholtz's survey.

On March 7, 2005, Union provided Ernzen with a copy of Dr. Fevurly's report. On March 23, 2005, Union provided Ernzen with copies of the September 16, 2004, surveillance video, and Union's October 5, 2004, November 14, 2004, December 16, 2004, and March 3, 2005, internal assessments. Union extended Green two extensions of time to submit additional evidence to consider.

On June 9, 2005, Green submitted additional documentation and arguments in support of his appeal. He submitted medical records from the Headache and Pain Center dated from June 21, 2004 through July 7, 2004; medical records from Dr. Rettinger dated from July 1, 2004, through March 8, 2005; medical records from Shawnee Mission Reference Laboratory dated from July 2, 2004 through March 2, 2005; medical records from Shawnee Mission Medical Center dated from November 6, 2004 through May 19, 2005; medical records from Joel R. Lane, M.D., dated from November 9, 2004, and December 7, 2004; medical records from Dr. Greenfield dated from December 13, 2004 through February 4, 2005; medical records from Dr. Michael E. Ryan, M.D., Neurology Consultants, dated from February 25, 2005 through March 7,

2005; letter from Norman Heisler, M.D., dated from March 10, 2005; medical records from Dr. Stephen Ruhlman, M.D; a February 25, 2005, written statement from Green regarding his examination by Dr. Fevurly; a letter from Dr. Selbert G. Chernoff, M.D., regarding Dr. Fevurly's report; and a report by James Hildre, a vocational expert, who concluded that Green "is not able to return to his usual occupation or able to perform at any other occupation."

Dr. Ruhlman, a rheumatologist, examined Green on March 28, 2005, and found that he had 18/18 tender points and a diagnosis of "fibromyalgia: fairly severe and will be difficult to improve."

Dr. Chernoff, an internist, reviewed Green's medical file and submitted a short report dated June 7, 2005. In his report Dr. Chernoff noted Green's medical file documented several impairments, the most important being fibromyalgia. With respect to the fibromyalgia diagnosis, he observed,

>    This [diagnosis] was suspected by his treating physician who referred him [to] Dr. David Cooley, rheumatologist, on 5/8/01 and made a diagnosis of fibromyalgia. He continued his tricyclic antidepressant – universally recommended for this illness, and suggested a serotonin agonist antidepressant as well. At an "Independent Medical Exam" of 1/26/05, Dr. Fevurly found generalized tenderness and mistakenly decided this ruled out FM as a diagnosis. His treating physician refers to this as an ongoing diagnosis, and we know he has been evaluated by multiple physicians including another rheumatologist with the same diagnosis. Dr. Fevurly has described walking to his car and to a store, seen on video surveillance, as evidence against the presence of fibromyalgia – another misunderstanding of the nature of the illness.
>
>    Fibromyalgia does not produce weakness – so except for pain, muscle power is intact. As a matter of fact, pain is the entire problem – as this man's history and findings indicate. Furthermore, the pain of fibromyalgia commonly can be reduced by bed rest or markedly reduced activity. Quite commonly this remission of pain seduces the patient into catching up work or chores, which immediately produces another flare of pain which

can only be relieved by returning to bed for a few days. This partially accounts for the "good day, bad day" phenomenon characteristic of the illness, although other factors can also flare the illness. . . .

. . . part of the material sent by Dr. Fevurly includes an article by Dr. Clauw. This material is extremely relevant. Dr. Clauw is a professor of rheumatology at [the] University of Michigan, who I had the pleasure of meeting and hearing at a meeting a few years ago. He runs a very large fibromyalgia/chronic fatigue clinic there and is an acknowledged international expert on the illness. His report stresses that diffuse tenderness is an intrinsic part of fibromyalgia, rather than ruling it out. He points out the error of depending entirely on the number of tender points to establish the diagnosis. I bring this out to document Dr. Fevurly's unfortunate error in diagnosis above.

Dr. Jones did an interesting review of Mr. Green's condition. He appears to want to say that the complaints are all psychologic in nature, but states that Mr. Green has not been compliant with psychologic care. One interpretation of this is the absence [of] significant psychologic disease – which is because fibromyalgia is not a psychiatric or psychologic illness. Dr. Jones complains that Mr. Green did not take the prescribed dose of Seroquel, but perhaps did not notice the part of the record that states he could not tolerate it because of GI problems, and that his treating physician stopped it. **Both Dr. Fevurly and Dr. Jones appear to deliver appraisals that contradict the medical facts to make the point that Green is not disabled.**

(Emphasis added.)

With respect to Green's other alleged medical problems Dr. Chernoff agrees that, "Mr. Green has several other relatively uncomplicated conditions that contribute to his pain, namely DJD of cervical and lumbar spine that have been treated unsuccessfully by Dr. Greenfield the pain specialist. In addition the impingement syndrome of his left shoulder limits him."

Dr. Chernoff also disagreed with Dr. Fevurly's critique of Green's usage of pain medication:

Dr. Fevurly gives an interesting opinion regarding the use of opioid medications, stating that they should only be used if

> "functional improvement" is the goal or occurring. This would be a problem for cancer patients, chronic arthritis patients, as well as fibromyalgia patients and others too numerous to even list. I don't believe this represents any known standard of care; our job as physicians is to cure when possible, but comfort always.

Finally, he disagrees with Dr. Fevurly's conclusion that Green is capable of any employment.

> It is evident that Mr. Green has severe impairments that prevents him from working at any type of employment. The most obvious one is fibromyalgia, that prevents sustained employment, even though a snapshot of his capacity at a given moment might give the opposite impression. **In my opinion he is incapable of even sedentary work if it needs to be done on a sustained schedule.**
>
> The recent evaluation by Dr. Ruhlman, rheumatologist[,] confirm both the diagnosis and severity of the illness.

(Emphasis added.)

Dr. Maikranz reviewed all the material Green submitted on June 9, 2005, and on July 11 she issued a second addendum to her August 25, 2004, "Clinical Services Summary." Dr. Maikranz noted that Green "continues to report musculoskeletal pain to his health care providers" and "continues to receive prescriptions for pain, muscle relaxation and sleep." Based on her review of Green's claim file and the newly-received information, Dr. Maikranz opined that "it appears [Green] had all the functional capacity to perform at least sustained sedentary work since 2/20/01." Dr. Maikranz concluded that "[b]ased on all the information received for review, [Green] appears to have the physical functional capacity to perform at least sustained sedentary work as long as he has the ability to change positions hourly and do bending, twisting, stooping and overhead work no more than an occasional basis."

On August 3, 2005, Richard Hubbard, Union's Vocational Services expert, issued a "Vocational Services General Assessment" report in response to an addendum which purportedly

revised the medical restrictions on Green's capabilities and limited him to an environment where he could vary his position between sitting and standing, and limited the amount he could lift to no more than 10 pounds. Hubbard concluded that with these new restrictions, which Umholtz's report claims to have already incorporated, Green could meet the work demands of only three of the ten positions identified in Umholtz's labor market survey.

On September 15, 2005, Union notified Green it was upholding its decision to deny benefits. Union noted Dr. Rettinger had refused to speak with Dr. Maikranz, that Ernzen refused to provide Dr. Vandenberg's evaluation and Dr. Heisler's medical records, and that Drs. Rettinger and Lehman refused Union's request that each provide his respective comments regarding the February 20, 2002, FCE. Union stated that "[b]ased on the information in the file, it is our conclusion that there is no condition that limits Mr. Green from performing at least one of the material duties of each gainful occupation for which his education, training and experience qualifies him."

**Union denies Green's second appeal.**

On March 15, 2006, Green appealed the September 15, 2005, denial to Union's Disability Claims Appeals Committee ("the Committee"). Green's appeal included a short vocational opinion addendum from Jerold Hildre dated March 13, 2006; a March 12, 2006, affidavit from Green; a March 10, 2006, letter from Dr. Rettinger commenting on the February 20, 2002, FCE; and a March 9, 2006, letter from Dr. Chertoff commenting on the February 20, 2002, FCE.

In the March 13, 2006 addendum to his previous vocational opinion Hildre wrote that,

> if a person must change positions from sitting to standing 'at will,' they would be unable to perform any work activity on a consistent, competitive employment level. This is because the need to change positions is not predictable. Therefore, it would interfere with being able to perform the job asks at a reasonable and typical job performance standards.

Dr. Rettinger also objected to Union's reliance on the findings of 2002 FCE, stating "Green must be able to rest 4-5 hours per in an eight hour workday." Dr. Rettinger acknowledged that "[t]he 2002 FCE was conducted on two consecutive days up to four hours each day," and conceded that the fact that "Green was able to function four hours per day for two days is inconsistent with my medical source statement in which I stated that Mr. Green could sit 2-3 hours in an eight hour day and stand less than one hour but must be able to rest 4-5 hours per day." Nonetheless, Dr. Rettinger disagreed with the FCE's conclusion that Green could perform sedentary work for an eight hour day. According to Dr. Rettinger, Green's fibromyalgia and neck and back pain precluded sustained work activity for eight hours a day, five days a week. Dr. Rettinger observed,

> The FCE alone is an inappropriate tool to test the endurance and/or performance of an individual with fibromyalgia. It is not that Mr. Green is incapable of sitting, walking and/or lifting 10 pounds. **He is incapable of doing these activities consistently eight hours per day five days per week. It is possible that he could function in a sedentary job for four hours two days a week (consistent with his FCE) but not eight hours a day five days a week and not even four hours a day five days a week.**

(Emphasis added.) Dr. Rettinger also noted that to treat his severe chronic pain, Mr. Green has taken pain relievers including MS Contin and Vicodin, as well as anti-anxiety and antidepressant medications, including Clonazepam, Remeron, Lexapro, and Tegretol.

Green subsequently submitted a second vocational expert report from Richard Sherman, Ph.D., who criticized Union's vocational analysis of Green's claim, explaining that Green would be unable to perform the jobs that Union alleged he could perform.

On April 21, 2006, Union wrote Green to inform him that the Committee met on April 20, 2006, to review his appeal and supplementary materials. The Committee then requested that

Hubbard perform a vocational assessment to address the vocational concerns set forth in Green's appeal.

On April 28, 2006, Hubbard issued a "Labor Market Survey Reassessment." In it he once again reassessed Umholtz's November 2002 labor market survey "using a strict interpretation of Sedentary work capacity . . ." Hubbard identified one position in the survey whose requirements were purportedly within Green's work experience and functional capacities.

On May 12, 2006, Union informed Green that the Committee had reviewed Hubbard's assessment and upheld the September 15, 2005, decision. Union advised Ernzen that Green could submit additional evidence no later than May 22, 2006.

On June 16, 2006, Green submitted to the Committee a report from Richard Sherman disputing Hubbard's April 28, 2006, vocational assessment. In his report Sherman pointed out that Hubbard stated Green could perform sedentary work "as long as he has the ability to change positions hourly" and that in its September 15, 2005 denial letter, Defendant stated Green could perform sedentary work as long as he has the ability to change positions "as needed." In response, Sherman wrote,

> "Regardless, a customer service position does not allow for either accommodation. As O'NET states, a customer service position allows alternating positions "almost never." Thus, Mr. Green would have to adhere to employment practices of a 15-minute break two hours after starting work, followed by a lunch break two hours after Mr. Green's first break, and finally a 15 minute break two hours after returning from lunch. This position does not allow for alternating positions "as needed" and/or every hour and there is no basis to conclude that any employer would be required to provide such an 'accommodation' for Mr. Green so that he could perform such positions [as suggested by Union]."

On July 31, 2006, Union wrote Green that the Committee had reviewed the additional material and all prior material and decided to uphold the September 15, 2005, decision. Union

explained that the Committee's determination was based on a review of Green's entire claim file. The Committee concluded that "Green has sufficient functional capacity to perform sustained sedentary work as long as he is able to change positions hourly. This was demonstrated by Mr. Green during the Functional Capacity Evaluation (FCE) and in the video surveillance." The Committee believed,

> Green's physicians' restrictions that he can sit for two to three hours, stand less than one hour; must rest four to five hours in an eight hour day; and that he can rarely or never lift from one to five pounds, balance, stoop, look down, look upward, look sideways to the right or left, use his hands or arms to reach, handle or finger are inconsistent with Mr. Green's own stated abilities and his capabilities objectively demonstrated on the FCE of February 20-21, 2002. At the FCE, Green demonstrated the ability to perform sedentary work for an eight-hour workday.

The Committee determined that "the behavioral health records in the file support that Mr. Green has mild dysthymic disorder, but fails to substantiate any significant mental health conditions or symptoms that would preclude Mr. Green from performing work."

With respect to its vocational assessment, the Committee determined that "the Labor Market Survey revealed a suitable occupation of Customer Service Representative, which Mr. Green is physically able to perform and for which he is qualified." Union stated that it considered the Social Security Administration's benefits determination but noted it is a different entity with a different set of rules, and that it did not have the same evidence available at the time the Social Security Administration made its decision. Union informed Ernzen that the Disability Appeals Committee was the final remedy available to Green and that his claim was now closed.

**Evidence concerning Union's impartiality.**

Union's investigator who placed the pretext telephone calls and performed surveillance on Green, Eric Gilbert, wrote in his annual self-evaluation that, "I have had 92 referrals this year

compared to 58 referrals at the same time last year - a 63% increase. Claims closed – 2002 –

$1,173,145.00, 2003 - $2,143,248 (21 claims) – a 54% increase." Gilbert also wrote,

> Surveillance timing: Due to the current claims process it takes 3-4 months on average after the surveillance to get a denial. Medical records, exams, TSA/LMS and financials have to be obtained and reviewed before a decision can be made. If possible I have tried to push the surveillance towards the end of this process. Any video information we have is more recent and has a greater impact. The video information is also recent enough to still impact the first level of appeal.

(Emphasis added.) Gilbert also observed that "[t]o attempt to discourage overturned claims I

have continued to work on the cases…"

Union contends it "compensates its consulting physicians and professionals on an hourly

basis, and Defendant compensates its employees with annual salaries that are not specific to the

work performed on any particular claim." Union denies it uses "any bonus, compensation

structure, monetary benefits or non-monetary benefits to incentivize the rendering of professional

opinions that would increase the likelihood of benefit denials."

Union's compensation manual is entitled "Fortis Benefits: Pay for Performance."

Union's "compensation philosophy" states that:

> 5. The company will control total compensation costs in line with financial results. Overall base pay is set at a moderate rate in the marketplace, but individuals who demonstrate superior competencies and skills will receive above-marketplace salaries. Bonus payouts will vary depending on financial results.

> 6. Variable pay (pay other than your base pay) plays a role in the overall compensation package and depends on company results. Because we recognized teamwork and cooperation as the means to achieve our desired results, team performance is the basis for this pay.

> 7. Financial performance will be the primary measure of Company results. Value drivers and customer satisfaction standards are used to measure team results as well.

The Fortis Benefits Compensation Manual also states, "Financial performance will be the primary measure of company results" and "we pay for performance."

**Discussion**

Under the "gainful occupation" definition of disability Green had the burden of proving that an injury prevents him "from performing at least one of the material duties of each gainful occupation for which his education, training, and experience qualified him." The record establishes that Green has disabling fibromyalgia, and that he was not capable of performing sedentary work eight hours a day for a full work week.

**I.** **Green suffers from disabling fibromyalgia, but has not documented any disabling psychological conditions.**

**A.** **The credible evidence establishes Green suffers from disabling fibromyalgia.**

The medical evidence on the record conclusively establishes that Green suffers from fibromyalgia. On May 23, 2001, a treating rheumatologist, Dr. David Cooley, M.D., F.A.C.P., noted that Green had "symptoms highly suggestive of a primary fibromyalgia disorder," a diagnosis that was confirmed on June 8, 2001, by Green's treating neurologist, Dr. Appelbaum; Union's own reviewing physician, Dr. Parmet; another rheumatologist, Dr. Ruhlman; and an internist who reviewed Green's medical file, Dr. Selbert Chernoff. Although fibromyalgia is a disease that invites skepticism because its diagnosis is heavily dependent on what the patient reports, it is a real disease and a severe case may render someone totally disabled. *See Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996) (Posner, J.). In this case no reasonable person could doubt the findings of two rheumatologists, a neurologist, an internist, and Union's own reviewing physician, all of whom found or concurred that Green suffered from fibromyalgia. The opinions of five different doctors, one of whom works for the Defendant, is enough.

Although Dr. Fevurly, an internist retained by Union to perform a medical evaluation of Green, found on January 27, 2005 that Green did not have fibromyalgia, this finding is not reasonable. Although he is not a rheumatologist and only examined Green for 23 minutes, and despite claiming to have reviewed Green's medical history which included a fibromyalgia diagnosis from a treating rheumatologist and a treating neurologist, Dr. Fevurly found that Green "does not meet the ACR [American College of Rheumatology] criteria for fibromyalgia disorder but demonstrates tenderness not localized to the 18 tender points of the ARC criteria." He gives little explanation for his finding, and this finding is difficult to reconcile with the entire medical record, especially since two months later a second rheumatologist, Dr. Ruhlman, examined Green and agreed with his treating rheumatologist that he had 18/18 tender points and a diagnosis of "fibromyalgia: fairly severe and will be difficult to improve."

The best explanation for the discrepancy between the medical record and Dr. Fevurly's opinion is that he does not fully understand or accept fibromyalgia as an illness, and he believed Green was simply claiming fibromyalgia to collect benefits, describing Green's pain as "functional somatic syndrome."[2] This is consistent with his attaching an excerpt from a book characterizing fibromyalgia as a "medical myth" kept alive by rheumatologists and plaintiffs' lawyers. The Court also notes a subsequent reviewing physician, Dr. Chernoff, criticized Dr. Fevurly's lack of knowledge concerning fibromyalgia in detail, and that this criticism is compelling. Consequently, Dr. Fevurly's opinion should be given no weight.

Finally, the Court notes that its finding that Green suffers from fibromyalgia is consistent with the ALJ's determination that Green suffered from fibromyalgia.

**B.      Green has failed to document any disabling psychological condition.**

_____

[2] "Somatization" is the process by which psychological needs are expressed in physical symptoms, e.g., a wish for material gain associated with a legal action following an injury. PDR Medical Dictionary 1634 (1st ed. 1995).

It is clear from the record that Green failed to comply with Union's reasonable request for documents related to his mental health and to submit to an independent medical examination by a psychologist. Accordingly, the Court does not consider any claims relating to Green's psychological condition. *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008) (noting the court only considers evidence that was before the administrator when the decision was made).

## II.    Union's determination that Green is capable of performing sedentary work for eight hours a day, five days a week is not supported by substantial evidence on the record.

The closer question in this case is whether substantial evidence on the record supports Union's conclusion that Green is capable of gainful occupation. Union argues the Healthsouth FCE, the surveillance tape of his daily activities, the medical record reviews from Dr. Parmet and Dr. Maikranz, the independent medical examination of Dr. Fevurly, and the vocational and labor market surveys all support its determination that Green was capable of performing sedentary work during an eight hour day.

Green contends the FCE does not take into account his inability to perform work day after day on a sustained schedule in the competitive work force; that the Court should give greater weight to the opinion of Green's treating physician, Dr. Rettinger; that the surveillance video does not support the termination decision; that Union's medical record review was selective, biased, and did not support its decision to deny benefits; and that the vocational and labor market surveys actually support a determination that Green is unable to work.

### A.    The Healthsouth FCE is of limited value.

The February 22, 2002 Healthsouth FCE found Green "is presently lifting in the sedentary category of work" as demonstrated by his ability to occasionally complete a floor to

knuckle lift of 10 pounds, knuckle to shoulder lift of 15 pounds, and a shoulder to overhead lift of 10 pounds. The report also indicated he could carry 10 lbs. 100 feet with pivoting. The report also indicated that Green demonstrated a tolerance of walking, climbing stairs with the use of a railing, bending his trunk (sustained and repetitive stoop), reaching overhead, twisting his trunk, reaching forward while standing (both repetitive and sustained) on an occasional basis, and reaching forward while standing and seated (both repetitive and sustained) on a frequent basis. It also found he could tolerate sitting on a constant basis. From these factors the report incorrectly concluded that, "Green demonstrates the ability to perform sedentary work for an eight hour day."

While an FCE can provide valuable objective evidence of a plaintiff's ability to work, *Jackson v. Metropolitan Life Ins. Co.*, 303 F.3d 884, 888 (8th Cir. 2002), its value is limited in determining the capabilities of an individual, such as Green, whose illness is characterized by variable symptoms. *Brown v. Continental Cas. Co.*, 348 F.Supp.2d 358, 367-68. The relevant question here is not whether Green can ever perform the activities associated with sedentary work, he obviously can, the question is whether he is capable of performing these activities eight hours per day, five days a week, for weeks on end as is required for gainful employment. While there is ample evidence on the record that Green can perform sedentary work for a few hours a day for a few days per week, there is not credible evidence on the record that Green perform such work for 40 hours a week, week after week. The undisputed evidence is that Green has good days and bad days, and that even on good days he requires an amount of rest that would be incompatible with full-time employment. Consequently no reasonable person could disagree with Drs. Chernoff and Rettinger's assessment that the Healthsouth FCE, by itself, is insufficient to determine whether Green is capable of performing sustained work on a normal work schedule.

## B.     The surveillance video does not support Union's determination.

The surveillance video suffers from the same limitation as the FCE does.  Although it shows Green performing for very short periods of time the sorts of activities that sedentary work would require—walking, sitting down, standing-up, driving, using his hands to manipulate items, etc.—it does not show that Green is capable of performing these activities for eight hours a day, five days a week, for weeks on end.  Indeed, the surveillance video only suggests Green can perform these activities for short periods of time.  In September of 2004 Union monitored and videotaped Green's activities over two days for a total of about 16 hours.  During this time he was out of his home for a total of about three hours, about 45 minutes on the first day and two hours and 15 minutes on the second day, and his most remarkable activities were getting into and out of a car, driving, opening a door, carrying a small box a short distance, and filling a car with gas.  While these activities indicate he can perform sedentary work for short amounts of time, they do not support a conclusion that Green can perform sedentary work full-time.  Engaging in the routine activities of daily life for a two hours a day is not the equivalent of being able to work on a full-time basis.  *Thivierge v. Hartford Life & Accident Ins. Co.*, No. C 05-0163 CW, 2006 Lexis 25216, at *31 (N.D. Cal. March 28, 2006) (holding walking, driving, and running errands for a couple of hours a day on five out of the six days the plaintiff was under surveillance did not mean the plaintiff was able to work an eight hour a day job).  A claimant need not be bedridden under the Policy to collect benefits, and neither Green or his doctors have suggested that he is incapacitated to the point that he is unable to drive, carry a small box, or occasionally run errands.

If anything Union's efforts show that beginning in April of 2002 the company suspected Green was not entitled to benefits and had begun building a case to support their denial of

benefits. Union submitted his file to its in-house investigative services unit on April 29, 2002. The investigator charged with investigating Green, Eric Gilbert, understood his role with the company was "to get a denial" and close claims so the company did not have to pay benefits. Gilbert noted in his self-evaluation that "[t]o attempt to discourage overturned claims I have continued to work on the cases…" While there is nothing wrong with an insurance company investigating claims it believes are suspicious, in this particular case it appears Union may have prejudged Green's application for long-term benefits.

C.     The medical record reviews are of limited value and do not support Union's determination.

Dr. Parmet and Dr. Maikranz's reviews of the medical evidence also do not support Union's determination that Green is capable of full-time sedentary labor. Dr. Parmet's opinion that Green met the diagnostic criteria of the American College of Rheumatology for fibromyalgia syndrome, that "his prognosis is guarded," and that it is "difficult to predict long term outcome of fibromyalgia cases," is well-taken. His conclusion that Green was capable of full-time sedentary work, however, is based entirely on the Healthsouth FCE, and so is only as reliable as the Healthsouth FCE.

Dr. Maikranz's report also does not support Union's determination. Although she states that Green "appears to have the capacity to do sedentary work that would allow for a position change hourly based on a diagnosis of fibromyalgia," a conclusion which appears to be based on the Healthsouth FCE, she also recommends an occupational medicine independent medical evaluation and another functional capacity evaluation be performed to clarify his physical functional status. This second FCE was not performed. Consequently the Court finds Dr.

Parmet and Dr. Maikranz's opinions with respect to Green's ability to perform sedentary work are of limited value.

### D.  A reasonable person could not give Dr. Fevurly's opinion any weight.

With respect to Dr. Fevurly's report, the Court reiterates its earlier finding that it cannot give his opinion any weight.  Dr. Fevurly's opinion that "[t]here are no objective factors upon which to recommend sitting or standing limitations.  There are no accommodations that are necessary for return to work.  Mr. Green is currently qualified to work a regular eight-hour day and/or 40-hour work shift based on objective factors" is completely inconsistent with the medical record.

### E.  The vocational and labor market studies do not support a finding that Green is able to find gainful employment.

When a benefit plan's determination turns on the claimant's ability to be gainfully employed, a vocational expert's opinion is required to provide substantial evidence to support the plan administrator's determination.  In the present case rehabilitation counselor Julie Finnegan, conducted a transferable skills analysis ("TSA") in August of 2002 to identify potential occupational positions that Green could perform given his work experience and medical restrictions.  She concluded that there were no suitable jobs in Green's labor market when considering his wage requirement of $10.45 an hour, but that he could potentially secure certain sedentary work with some features of light work, positions that paid an hourly wage of $7.54.  Union subsequently commissioned a labor market survey ("LMS") from Brenda Umholtz, who purported to identify ten jobs Green could perform.  Umholtz claimed "these positions were relatively easy to locate even with [Plaintiff's] restrictions of alternative sitting/standing and lifting under 10 pounds."  As part of Green's appeal he submitted a report from vocational expert

Jerold Hildre who concluded that the TSA failed to show or find suitable jobs that Green could perform, and that Union incorrectly interpreted the results of Brenda Umholtz's LMS. In March of 2005, Richard Hubbard, Union's vocational expert, revised Union's determination in light of Hilde's criticism and found that Green could perform only eight of the ten positions. In August of 2005 this figure was subsequently revised downward again to three positions in recognition of Green's need to be allowed to vary his position from seated to standing at will and lift no more than 10 pounds. After Hildre issued an addendum criticizing these findings in March of 2006, Hubbard re-revisited his assessment in April of 2006. This time he identified only one job out of the original ten in Umholtz's labor market survey that Green could perform.

Green argues that the fact that Hubbard changed his position three times during the appeals process indicates his motives should be questioned. Union argues that this simply demonstrates a robust willingness on its part to re-evaluate a claim when additional evidence is provided. It appears Hubbard changed his opinion in response to additional restrictions that were placed on Green's capacities throughout the determination process, not because he was attempting to "massage" the numbers. That said, these additional restrictions should have been included in the survey results from the outset. Umholtz's report, for example, claims that the restrictions of alternative sitting/standing and lifting under 10 pounds was included in her original research, but in fact this restriction was not included until Hubbard's *second* revision, at which point Hubbard opined Green could perform only three of the ten jobs originally identified. The Court finds a reasonable person cannot have any confidence in Union's labor market survey because of the way it has been repeatedly revised. Indeed, given Hildre's contention that customer service positions "almost never" allow for alternating positions, it is unclear whether Green would in fact ever be hired for the one job Union has identified he could get.

**F.     Green has established that he cannot perform full-time work.**

Although there is conflicting evidence concerning the extent of Green's disability, the evidence on the record establishes that Green cannot perform work, even sedentary work, for eight hours a day, five days a week.  Dr. Rettinger, Green's treating physician since 2001 and the doctor who spent more time with Green than any other, flatly stated on March 10, 2006 that Green was incapable of working consistently "eight hours per day five days per week.  It is possible that he could function in a sedentary job for four hours two days a week (consistent with his FCE) but not eight hours a day five days a week, not even four hours a day five days a week."   In June of 2005 Dr. Chernoff found Green's fibromyalgia prevented sustained employment, "even though a snapshot of his capacity at a given moment might give the opposite impression."  In Dr. Chernoff's opinion Green "is incapable of even sedentary work if it needs to be done on a sustained schedule."  Both of these opinions are consistent with the ALJ's opinion in February 2003 that Green did not have the residual functional capacity for "competitive employment at any exertional level due primarily to his unremitting pain, fatigue and need to rest during the day."

**III.    Union's conflict of interest weighs in favor of finding an abuse of discretion.**

Where, as here, the plan administrator both evaluates claims for benefits and pays benefits claims it approves, the administrator is operating under a conflict of interest that must be weighed as a factor in the Court's determination whether the denial of benefits was an abuse of discretion.  *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2350 (2008).  A claim administrator's inherent conflict of interest is weighed as one of several factors and "serves 'as a tiebreaker when the other factors are closely balanced.'"  *Hackett v. Standard Ins. Co.*, 559 F.3d 825, 830 (8th Cir. 2009) (citing *Glenn*, 128 S.Ct. at 2352).  The conflict of interest "is 'more

important . . . where circumstances suggest a higher likelihood that it affected the benefits decision' and 'less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy.'" *Hackett*, 559 F.3d 830 (quoting *Glenn*, 128 S.Ct. at 2351). This conflict takes on greater significance where the insurer 1) encourages the claimant to apply for social security disability benefits, and then disregards the Social Security Administration's finding that the claimant can perform no work, and 2) emphasizes medical records which support a denial of benefits over records suggesting a contrary conclusion. *Hackett*, 559 F.3d at 830 (citing *Glenn*, 128 S.Ct. at 2352).

The Court finds that Union encouraged Green to apply for social security benefits and then disregarded the SSA's finding that he was disabled. Although the evidence presented to the SSA was slightly different less than that presented to Union with respect to Green's psychological conditions—he failed to provide Union with psychological evaluations from two doctors who evaluated Green for the SSA—Green presented more evidence to Union than he provided to the SSA with respect to his fibromyalgia and ability to work. In making its determination Union had the benefit of the opinions of a third rheumatologist, Dr. Ruhlman, a reviewing internist, Dr. Chernoff, and Green's vocational expert, Jerold Hildre, all three of whom supported Green's claim.

The Court also finds that Union has emphasized medical records which support a denial of benefits over records suggesting a contrary conclusion. Union has unduly emphasized Dr. Fevurly's report and at the same time downplayed the opinions of the three rheumatologists and Dr. Chernoff. Consequently the Court finds that Union's conflict of interest should be weighed in determining whether Union abused its discretion, and that this conflict is entitled to greater

than normal significance.  As a result the Court holds that the tiebreaker factor here weighs in Plaintiff's favor.

## Conclusion

Finding that Green has established that he cannot perform full-time work because of his fibromyalgia, that Union's determination that Green is capable of performing sedentary work is not supported by substantial evidence on the record, and that to the extent the factors are closely balanced here, the conflict of interest "tiebreaker" falls squarely on Green's side of the scale, the Court DENIES Defendant Union Security Insurance Company's Motion for Summary Judgment (Doc. 58) and GRANTS Plaintiff Charles Green's Motion for Summary Judgment (Doc. 60).

**IT IS SO ORDERED.**

Date:   March 31, 2010                                  /s/ Greg Kays_____
                                                       GREG KAYS, JUDGE
                                                       UNITED STATES DISTRICT COURT